Birchard, Judge.
This case is the same that is reported in 11 Ohio, 501, and is before us on a petition for rehearing, which, by consent, is to be treated as a bill of review, and on exceptions to the master’s report.
It is contended that the court erred, on the first hearing, in determining that a good cause of action was made by the case, and that the proper parties were before the court.
The basis of the first supposed error is the alleged want of a contract unperformed by the state. In determining the ease, as reported in 11 Ohio, all the points now presented, and not arising upon the report of the master, made pursuant to that decree, were fully considered, and intended to be settled. We have again considered them, after full and elaborate argument, and are still satisfied with the governing principles of that decision. A special jurisdiction is conferred by statute, and the rule of action is not left to be gathered entirely from the general rules established by courts, in ordinary trials at Jaw and chancery. We are enjoined, by the act, to investigate and decide the case “ upon the principles of justice and good faith,” and, upon the final hearing, upon the principles aforesaid, to render such decree as, in our opinion, “ the principles of justice and good faith demand.”
A contract was made, and land conveyed under it, to enable the state to avail itself of the water power created by the canal, at a time when the state knew of no other way in which it could be used. Seely was to excavate a race, which would cost large sums of money, and look to the benefits to be derived from the use of the water at that place, for his remuneration, *and the agents of the state agreed to use the [522 water there, as an inducement to the expenditure of his money for that purpose. Upon principles of justice, this was a contract *523 Legally, or at law, the portion of the terms and stipulations not embraced in the writing then executed, were no part of the contract; not because it would be just to disregard the unwritten terms, but because a rule of policy forbids ; because, if parol evidence were allowed, as a general rule, to control or alter written contracts, a great door for the entrance of fraud and perjury would be thrown open. The state of Ohio disclaims, by the act, all benefit from such rules, as applicable to this controversy. The legislature has forbid the application, and commanded us to judge and determine her contract as it was, in fact, made ; to disregard the writing, and look to the real contract, if good faith so demands. The language more than intimates that the state can not, without dishonor, condescend to take a technical advantage, and exclude the material parts of an agreement because omitted in the writing, and thus rob a citizen by virtue of a rule of policy, although sound, as •applied in ordinary cases. The standard given is worthy a state like this, and it is the only one by which our people should ever wish to see Ohio, in her sovereign capacity, guided. Counsel say, that “ it speaks poorly for law and equity that the court should find itself able to do better justice without precedent or rule,” than by following long established rules. To this it may be said, that it certainly would not speak well for law or equity, were a court, under the influence of a blind and prohibited adherence to a technical rule, to depart from the manifest spirit of a positive statute, for the purpose of working out injustice to a fellow citizen. Were any thiug needed, beyond what is to be found in the words of the statute, to direct us in arriving at the meaning of the General Assembly, the history of this legislation, and the facts in proof, would be ample. The written contract was before the legislature on numerous occasions. The letter of it had been complied with by the state. Yet a law was enacted, directing the agents of the state to pay Seely $5,000 on account of the contract. 523] Upon *the legal principles recognized, and acted on, by courts of justice, the state was not bound to pay this sum, for the written stipulations had not been so violated as to present a cause of action. The members of the committee say they looked beyond the writing, and ■considered the actual consideration and terms of the contract, and were willing then to allow $15,000, and would have done so, if Seely would have accepted it.
The act which then became a law shows that the legislature did not stop to inquire what the writing contained, with intent to be governed by that alone. They did not seem to think such a course consistent *524 with justice, while they knew it would violate good faith to disregards the parts of the contract that were omitted in the writing, but well understood between the parties. Hence the precaution was taken of directing the court as to the principle by which to be guided in deciding upon it.
Again it is said, that Seely, by completing the race, has never rendered it possible for the state to comply on her part. This is a mere quibble. The proof shows that when the injunction was obtained against the state, by Cooper’s heirs, more than $9,000 had been expended on the race; that the work was so nearly finished that the commissioner had advertised the sale of the water power to be used at the place; that the work was in progress, and would have been soon completed — some of the witnesses say, in a day or two. Thus stood matters when the injunction was pending. When it was dissolved the canal commissioners leased the water power to be used elsewhere, and thus put it out of the power of the state to fulfill on her part. What right had they to ask Seely to make further expenditures after this ?' How would th« completion of the race benefit the state, or him? An. act ha^d been done, by the canal commissioners, rendering the expenditures incurred, as well as what was needed to finish the race, entirely useless. It would require new notions of justice to sustain such a defence.
*Again, it is said that the acceptance of the $5,000 was in- [524-tended as a settlement of his whole claim. This point is not so strenuously urged as on a former occasion, yet it will be considered. If the $5,000 was intended as a satisfaction, most likely there would be-something that would tend to prove the fact. The act providing for the payment of the $5,000 gives us no light on the subject. It does not purport to he in full satisfaction, or even look that way. Seely gave express evidence, on receiving the money, that he did not so treat it. The members of the committee, who reported the bill, swear that it was not intended as a discharge, and that the committee would then have given some $15,000, if Seely would have been satisfied therewith. The law under which we act, is, at least, some evidence that the claim was, by neither party, considered as finally adjusted. The whole, put together, ought to satisfy one that this objection is wholly groundless.
The remaining question to be reviewed, is, whether the proper parties are before the court.
The assignment to the commissioner of insolvents vested in that officer, in 1832, all the rights which complainant had, either legal or *525 •equitable. If this claim falls within either class of rights, then the objection is well taken ; otherwise, not. Now, it is worthy of remark that the able counsel for the state, both at the-original hearing and now, have furnished very conclusive arguments, and such as have satisfied every member of this court, that, at the time of the assignment to the commissioner of insolvents, he had no right against the state, either at law or in equity, id est; no right that could be enforced, according to any known code of law, or by any legal proceeding. Had the state been suable, as a natural person, the rules of equity, as ordinarily administered, we all agree, could have afforded him no relief. The rules of law would have given nothing, Hence the deed of assignment passed nothing, upon the obvious principle that a grantor can convey no better title than the one he possesses. The assignment does not profess to touch this claim, and the operative words of the insol,525] vent law are not broad enough to cover it. In a*moral point of view, it may be just that the creditors should receive this fund. If their demands'still exist against complainant, the way is open for them to obtain the money. The statute, however, gives the right to maintain this suit against the state to Seely, and to no one else, and this in order that the demand may be settled upon the principles of justice and good faith. Neither the commissioner of insolvents, nor Seely’s creditors, are named in the act, or authorized by it to become parties complainant against the state, and it is not essential to the object had in view by the legislature, that they should be made parties. Were we entirely in error as to the view taken of the rights of the creditor, -or commissioner, under the assignment, it would not necessarily follow that this bill should be dismissed,
But the authorities will not sustain the views of counsel. Milnor et al. v. Metz, 16 Peters, 221, is a case, as we conceive, against them. It was a claim for services, as gauger, which might have been offset at law against any claim prosecuted against the insolvent by the United States. Fillebrown’s case, 7 Peters, 1, and McDaniel’s, 7 Peters, 50, are full to this point, It was, therefore, a claim that- law or equity would have recognized, and which existed at the time the assignment was executed. The case of Comeyges v. Vasse, 1 Peters, 196, stands upon the same principle. Yasse, as underwriter, had succeeded to the rights of the owner of a vessel, wrongfully condemned by a Spanish prize court, whose sentence was final as to the right to the vessel, but, upon principles of national law, Vasse still had a right, a just claim, to remuneration. It was a legal right, which the United States were, *526 in duty, bound to enforce against Spain, and was, therefore, held to have passed by the assignment. Not so with this claim. No power could have enforced it, in any form, against the will of the state. It depended solely on her own sense of justice, and its consent to satisfy it, is purely voluntary. A pension granted for military services, might, with as much propriety, be claimed by the assignee of an insolvent, as this. Emmerson v. Ball, 13 Peters, 409.
*The exceptions to the report remain to be considered. The [526 first and second do not seem to be well taken. There is no reason why the master should have taken the testimony of Messrs. Young and Forrer as verity, and disregarded all the other evidence in the ease. It was his duty to allow a fair compensation for the work bestowed upon the race, basin, and towpath, and to gather the facts from all the evidence, acting upon it, and weighing it, as a jury would on a trial of an inquest of damages. There is very little difference between these witnesses and others, as to the amount of work performed, but a very great one as to the value per yard for the excavation. The additional allowance of the former, for excavation under eighteen inches of Water, is three or four cents per yard, Several experienced contractors, and three or four other engineers, concur in testifying that this estimate is entirely too low. No one puts it at less than three times that amount, while the actual cost shows that it was too low. The Master was governed by the weight of evidence, and, in our opinion, it fully sustains him, except as to the item of $350, for complainant’s services, which should be disallowed.
The fourth exception is sustained, and the fifth is already disposed of by this opinion,
The third exception is not well taken. The value of the land is fairly estimated at $200 per acre, as shown by the proof. It appears to have been dedicated to the public by complainant, or by others, at his instance, and on contracts made with him. The allowance does not more than cover the expenses of the item.
Decree for complainant.